AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| | |
|---|---|
| United States of America<br>v.<br><br>VINCENT MILLER<br><br>*Defendant(s)* | )<br>)<br>) Case No. 3:19 mj 382<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __4/2/19, 4/18/19, 5/14/19, 6/20/19__ in the county of __Montgomery__ in the __Southern__ District of __Ohio__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with intent to distribute a controlled substance |

This criminal complaint is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.

_____
Complainant's signature

SA Dennnis Eng, FBI
Printed name and title

Sworn to before me and signed in my presence.

Date: 7/10/19

_____
Judge's signature

City and state: Dayton, Ohio

Hon. Sharon L. Ovington, U.S. Magistrate Judge
Printed name and title

# AFFIDAVIT

I, Dennis C. Eng, being duly sworn, do hereby depose and state as follows:

## I.

## INTRODUCTION

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since July 1998. I am currently assigned to the Cincinnati Division, Dayton Resident Agency. As such, I am charged with investigating crimes against the United States, including but not limited to violations of Title 18 and Title 21 of the United States Code (U.S.C.). I have received training in drug trafficking investigations and have participated in numerous narcotics-related investigations (ultimately leading to successful prosecution) that involved surveillance, gathering evidence of money laundering, interviewing suspected drug traffickers, and supervising the activities of informants who provided information and assistance which resulted in the seizure of narcotics. I am familiar with federal drug laws, and am aware that it is a violation of Title 21, U.S.C., Sections 841(a)(1) and 846 to distribute and possess with intent to distribute controlled substances (including heroin and fentanyl), as well as to conspire to do the same.

## II.

## PURPOSE OF AFFIDAVIT

2. This Affidavit is submitted in support of a criminal complaint, and seeks the issuance of an arrest warrant against **Vincent MILLER** for violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances). The information contained in this Affidavit is largely based upon an investigation conducted by me and other law enforcement officers. All of the details of the investigation are not included in this Affidavit, rather only information necessary to establish probable cause of the above-described violations.

3. I also make this affidavit in support of a search warrant for the following premises as there is probable cause to believe that evidence, contraband, fruits of a crime, other items illegally possessed as well as property designed for use, intended for use, or used in committing violations of 21 U.S.C. §§ 841 and 846 (conspiracy to distribute and possess with intent to distribute controlled substances) exists and can be found at the location described below and further described in Attachment A. A list of the specific items to be seized from the premises described above is attached hereto as Attachment B, and Attachment B is incorporated herein by reference. Based on my training and experience, as described above, I believe that there is probable cause to believe that the items listed in Attachment B will be found at the premises described in Attachment A. All of the details of the investigation are not included in this Affidavit, only information necessary to establish probable cause that evidence associated with narcotics offenses is located in each of the premises.

    a. **7707 Tanager Meadows, Dayton, Ohio 45426**, including any outbuildings and curtilage at this location. This premises is more fully described in Attachment A, and Attachment A is incorporated herein by reference.

1

4. Based on my aforementioned training and experience, I am familiar with the modus operandi of persons involved in the illicit distribution of controlled substances and as a result, knows the following:

    a. It is common practice for drug traffickers to hide their assets, their addresses, their telephone numbers and cellular services by using other person's names in order to avoid detection by law enforcement officials.

    b. It is common practice for drug traffickers to often maintain residences which are used as "stash houses" or locations for drug storage and distribution, and use "nominees" to obtain telephone service, utility service, and other services to hide the true identity of the owner or person who will use that service.

    c. That drug traffickers often place assets in corporate entities in order to avoid detection of those assets by law enforcement officials.

    d. It is common practice, that even though these assets are in nominee names, drug traffickers will continue to utilize these assets by exercising dominion and control over them.

    e. It is common practice that drug traffickers possess large amounts of U.S. Currency in order to finance their ongoing illicit drug business.

    f. It is common practice that drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other documents relating to the transportation and distribution of drugs. Drug traffickers commonly front (provide drugs on consignment) to their clients. The books, records, receipts, notes, ledgers, and other documents are kept where the drug traffickers have ready access to them.

    g. It is common for drug traffickers to provide false information to law enforcement officials regarding their identity and the address of their actual residence.

    h. That persons involved in drug trafficking conceal from law enforcement in their residences, vehicles, and businesses the following items: drugs, large amounts of currency, financial instruments, jewelry, automobile titles, other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to the acquisition and concealment of large sums of money resulting from drug trafficking activities.

    i. When drug traffickers amass large proceeds from the sale of drugs, they attempt to hide the true source of these profits, otherwise known as laundering the money. To accomplish this, drug traffickers many times utilize banks and/or financial institutions with their attendant services, including but not limited to, cashier's checks, money drafts, and letters of credit. Other entities used to launder drug proceeds include real estate firms and purported legitimate business fronts.

j. Drug traffickers commonly travel to facilitate their trafficking activities. After purchasing drugs, traffickers commonly transport, or cause to be transported, drugs to areas in which they will be distributed. Common methods of transportation include, but are not limited to, commercial airlines, and rental/private automobiles.

k. It is common practice that drug traffickers commonly maintain books and similar documents which reflect names, addresses, and/or telephone numbers of their associates in the drug trafficking organization. This information can often be stored in cellular phones in places such as the contacts list.

l. Drug traffickers often take, or cause to be taken, photographs of themselves, their associates, their property and their product, and that the photographs are usually maintained at the residences and/or businesses of drug traffickers. Photographs such as these can commonly be found and stored in cellular phones.

m. Drug traffickers commonly have in their possession, (that is on their person, at their residence, and/or their business) weapons, including firearms of various types. Firearms are used to protect and secure a drug trafficker's property which may include, but is not limited to, narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. Currency.

n. Drug traffickers frequently maintain hidden compartments within their residence and vehicles to hide drug trafficking evidence (money, ledgers, drugs, etc.), bury evidence in containers such as shoe boxes, or hide the evidence in safes.

o. The exact quantities, prices, dates, and methods of delivery of drugs are seldom discussed in detailed terms over the telephone. These details are usually agreed upon during face-to-face transactions. For this reason, most telephone conversations regarding drugs are very brief and often in code, understood by the traffickers and designed to mislead or confuse non-participants of the conversations. Drug traffickers make extensive use of cellular phones and text messaging beepers/pagers to facilitate contacting one another. When calling a beeper or text messaging, traffickers commonly input the number that should be called and sometimes add additional instructions in the form of additional digits. The structure of a drug distribution organization usually consists of sources of supply, wholesale distributors, retail distributors, and the ultimate consumers. The wholesale distributors often have more than one source of supply, and likewise the retail distributors often obtain drugs from more than one wholesale distributor. After receiving a quantity of drugs, the source of supply will often move the drugs to a location other than where he/she sells them to the wholesale distributors. The location of the source of supply's so-called "stash house" is generally a well-guarded secret known only to the source of supply and his closest associates. Most of the drugs, as well as diluting and packaging materials and weighing equipment, are usually kept at the "stash house." Only those amounts needed for immediate sale are usually kept at the point of sale.

3

p. Drug traffickers frequently use rental vehicles for everyday travel and will maintain another vehicle, usually at an out of sight location, to facilitate their drug trafficking business.

q. Evidence of past communication between drug traffickers can be found in saved or deleted text messages, call logs, and other forms of electronic communication occurring over, stored in, or accessed by the cellular phone.

r. I have repeatedly encountered a practice wherein drug traffickers distribute a cellular telephone number to their drug customers, often described by traffickers as a "money phone." The money phone is used primarily to communicate with those customers. The customers will subsequently call the trafficker on that cellular telephone number to arrange a purchase of drugs as needed. The trafficker will many times field calls from several customers at once, and then direct all those customers to travel in their car to a designated meeting point. Once all the customers have driven to the designated place, the drug trafficker will appear in his vehicle, quickly conduct hand to hand drug transactions with each customer, and then drive away.

### III.

### FACTS SUPPORTING PROBABLE CAUSE

5. The United States, including the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and the Federal Bureau of Investigation ("FBI"), are conducting a criminal investigation of Vincent MILLER a/k/a "Turk" in possible violations of Title 21 U.S.C. §§ 841 and 846.

6. Tactical Crime Suppression Unit ("TCSU") controls a confidential informant (hereinafter referred to as "CI1") whose identity is documented by TCSU and is known to detectives and is working for financial consideration. CI1 has provided reliable and actionable information in assisting TCSU since July 2018 with several investigations. The TCSU CI1 is currently assisting FBI and ATF with a federal criminal investigation. Information provided by CI1 has been corroborated throughout the course of multiple TCSU investigations. Information provided by the TCSU CI1, as well as actions of CI1 at the direction of TCSU, have resulted in obtaining physical evidence of state criminal violations.

7. In early 2019, TCSU detectives began investigating Shaun QUILLEN (hereinafter referred to as QUILLEN) through CI1's information that QUILLEN was selling heroin/fentanyl. CI1 has known QUILLEN for a number of years. TCSU detectives have conducted several undercover purchases of heroin/fentanyl from QUILLEN utilizing the CI1 and an undercover officer.

8. CI1 said that approximately a year and half ago QUILLEN introduced his source of supply, "Turk", to CI1 and provided cellular telephone number (937) 397-1560 as belonging to "Turk". "Turk" was later identified by law enforcement as **MILLER**. CI1 said that QUILLEN

4

had taken him/her to meet **MILLER** at 6645 Wolf Creek Pike, Dayton, Ohio where QUILLEN and others would meet to conduct drug transactions. CI1 told TCSU detectives that QUILLEN and CI1 had previously met **MILLER** at 975 Haller Avenue, Dayton, Ohio. CI1 told TCSU detectives that **MILLER's** mother was believed to reside at the address.

9. On or about March 28, 2019, TCSU detectives learned that QUILLEN would be meeting **MILLER** to purchase more drugs. TCSU detectives surveilled QUILLEN and a female who they believed was QUILLEN's girlfriend, "AS", to 6645 Wolf Creek Pike where TSCU detectives observed QUILLEN meet with **MILLER**. TCSU detectives observed the exchange of suspected drugs between **MILLER** and QUILLEN. TCSU detectives observed **MILLER** driving a silver Ford Edge at the meeting. Before meeting with QUILLEN, TCSU detectives observed **MILLER** conducting a suspected drug transaction with another male from Waynesville, Ohio who TCSU detectives identified from a vehicle license plate.

10. On or about April 2, 2019, TCSU and FBI met at a briefing to conduct an undercover purchase of heroin/fentanyl from **MILLER** by CI1. After the brief, TCSU Detective Gregory Stout and Director Robert Green met with CI1 at a predetermined location. While at this location, a search of the CI1's person was conducted for contraband and weapons. The search produced negative results. CI1 was provided with an electronic transmitting /recording device and prerecorded buy money to purchase a half ounce of heroin/fentanyl for $1,050.

11. On that same date, at the direction of TCSU, CI1 placed a recorded cellular telephone call to **MILLER** at (937) 397-1560 prior to the controlled operation. During the course of the call, CI1 spoke with a person who CI1 confirmed was **MILLER** and CI1 asked if he (**MILLER**) "can do a half O." **MILLER** responded "yeah." Using somewhat cryptic language, CI1 and **MILLER** confirmed the price of $1050 and discussed a meeting location. **MILLER** advised the CI1 to meet him (**MILLER**) at "April's". CI1 stated April's address is 4998 Wolf Creek Pike, Dayton, Ohio. After the telephone call, CI1 got into his/her vehicle and left the staging location. During the undercover purchase, law enforcement was conducting surveillance and able to observe portions of the interaction.

12. At approximately 2:39 p.m., CI1 arrived at 4998 Wolf Creek and shortly afterward **MILLER** arrived in the silver Ford Edge. CI1 greeted **MILLER** and asked him "what up boy." **MILLER** and CI1 had a brief discussion and then the CI1 exchanged the $1050 for a half ounce of suspected heroin/fentanyl. CI1 laughed, and **MILLER** stated "Ah be careful call me man...." CI1 replied, "I will man, I'm getting the hell out of here as fast as possible...." Law enforcement conducting surveillance observed a white female present at 4998 Wolf Creek during the exchange.

13. At approximately 2:40 p.m., **MILLER** and CI1 departed 4998 Wolf Creek Pike. The CI1 then proceeded back to a debrief location where CI1 turned over the suspected heroin/fentanyl to law enforcement. The suspected heroin/fentanyl was placed into property at the TCSU property room, and later sent to the Ohio Bureau of Criminal Investigation (hereinafter referred to as "BCI") laboratory for analysis. The suspected heroin/fentanyl packaged in a plastic baggie weighed approximately 13.4 grams. Subsequent laboratory results determined the white powder to be 12.28 +/- 0.04 grams of Fentanyl.

14. On or about April 3, 2019 and based on information learned through law enforcement investigative databases, the white female by the name "April" referenced by

5

**MILLER** who resides at 4998 Wolf Creek Pike and who was observed during the undercover purchase was likely identified as being "AC." AC was arrested on August 15, 2016, for drug possession at 4998 Wolf Creek Pike.

15. On or about April 9, 2019, an administrative subpoena was issued to Dayton Power and Light (DP&L) request utility subscriber information for 4998 Wolf Creek Pike, Dayton, Ohio 45426. On or about that same date, DP&L responded that the utility subscriber was "CT" with a date of birth XX/XX/1928 and security number XXX-XX-4953.

16. On or about April 18, 2019, an administrative subpoena was issued to Enterprise Holdings (hereinafter referred to as "Enterprise") requesting information on **MILLER**'s rental vehicle(s). Enterprise responded that **MILLER** had rented the silver Ford Edge bearing Virginia license plate number UXN9935 on April 2, 2019, which was previously observed during the surveillance by TCSU detectives. However, Enterprise responded that **MILLER** was currently renting a Nissan Rogue bearing Ohio license plate number HRL8058.

17. On that same date, TCSU, FBI and ATF met at a briefing to conduct an undercover purchase of heroin/fentanyl from **MILLER** by CI1. After the briefing, TCSU Detectives Gregory Stout, Jason Stamm, Jeff Yount and Director Robert Green met with CI1 at a predetermined location. While at this location, a search of CI1's person was conducted for contraband and weapons. The search produced negative results. CI1 was provided with an electronic transmitting/recording device and prerecorded buy money to purchase a half ounce of heroin/fentanyl for $1,050.

18. On that same date, at the direction of TCSU, CI1 placed a recorded cellular telephone call to **MILLER** at (937) 397-1560 prior to the controlled operation. CI1 had confirmed that the person he/she spoke was "Turk". During the course of the call, CI1 spoke with **MILLER** and he/she asked if he (**MILLER**) "can do another half and um did you ever check on a pistol for me." **MILLER** responded he didn't know and would have to wait. CI1 told **MILLER** that if he (**MILLER**) can line one up (meaning getting a pistol), he/she could grab the pistol when CI1 comes for another half or whole (meaning heroin/fentanyl). **MILLER** told CI1 that depending on price range, **MILLER** can get a Glock, Smith and Wesson or Springfield. CI1 inquired about price and **MILLER** told the CI1 it would be $300 to $450 and he (**MILLER**) would find a 9mm or .40 caliber for CI1. CI1 responded that would be great and asked **MILLER** where to meet for the deal. **MILLER** directed CI1 to AC's house (referring to 4998 Wolf Creek Pike, which was the location of the undercover buy on April 2, 2019).

19. At approximately 2:30 p.m., CI1 arrived at 4998 Wolf Creek Pike at which time **MILLER** arrived in a black Nissan Rogue. AC who was identified from the undercover transaction on April 2, 2019 walked up to CI1 as he/she arrived. AC told CI1, "I'll get it for ya." The interaction between CI1 and AC was captured on video and audio recording. Additionally, the surveillance units took photographs of the interaction. CI1 declined and approached **MILLER** sitting in the driver's side of the Nissan Rogue. AC was observed by surveillance units with a white male, dark hair of approximately 40 years old at the time who stated to the CI1 on recording, "can't make it look obvious." According to CI1, they conducted the transaction through the driver's side window and exchanged the pre-recorded $1,050 for a bag of off-white powder. The recording device captured CI1 and **MILLER** discussing the pre-recorded buy

6

money, and they followed up on their prior conversation about a "piece" (meaning a firearm). After the transaction, CI1 then returned to his/her vehicle.

20. At approximately 2:32 p.m., **MILLER** and CI1 departed 4998 Wolf Creek Pike. The CI1 then proceeded back to a debrief location. During the debrief, CI1 said he/she observed a digital scale and plate in the passenger side of **MILLER**'s vehicle. The suspected heroin/fentanyl was placed into property at the TCSU property room, and later sent to BCI for analysis. The suspected heroin/fentanyl packaged in a plastic baggie weighed approximately 16.7 grams. Subsequent laboratory results determined the white powder to be 14.08 +/- 0.04 grams of Fentanyl.

21. On April 30, 2019, TCSU Detective Stout and I met with CI1 to conduct a recorded cellular telephone call to **MILLER** at (937) 397-1560. During the call, CI1 spoke with a person who CI1 confirmed was **MILLER** and CI1 asked **MILLER** about purchasing a firearm from **MILLER**. **MILLER** told CI1 that he had a little Mac-9 for $600. CI1 indicated he would get back to **MILLER**.

22. On May 1, 2019, CI1 contacted TCSU Detective Stout that **MILLER** had contacted him/her to offer a High Point .40 caliber for $160.00.

23. On May 6, 2019, a federal search and seizure warrant under case number 3:19mj253 was signed in the United States District Court for the Southern District of Ohio by United States Magistrate Judge Sharon L. Ovington for cellular telephone number (937) 397-1560. The warrant authorized historical cell site data and text messaging.

24. On or about May 9, 2019, TCSU, FBI and ATF met at a briefing to conduct an undercover purchase of heroin/fentanyl from **MILLER** by CI1. After the brief, TCSU Detective Gregory Stout, Jason Stamm, Jeff Yount, and Director Robert Green met with CI1 at a predetermined location. While at this location, a search of CI1's person was conducted for contraband and weapons. The search produced negative results. CI1 was provided with an electronic transmitting /recording device and prerecorded buy money to purchase a half ounce of heroin/fentanyl for $1,050.

25. On that same date, at the direction of TCSU, CI1 placed a recorded cellular telephone call to **MILLER** at (937) 397-1560 prior to the controlled operation. CI1 had confirmed that the person he/she spoke with on cellular telephone number (937) 397-1560 was "Turk". During the course of the call, CI1 asked **MILLER** about a firearm for sale. **MILLER** told CI1 the Mac-9 was gone. CI1 asked **MILLER** if **MILLER** would sell his (meaning **MILLER**'s) firearm and **MILLER** responded "what I'm goanna do." CI1 then asked **MILLER**, "you got a half ounce?" **MILLER** replied "hell yea." **MILLER** told CI1 to call back in twenty minutes.

26. At the time of this call, surveillance units were in the area of Wolf Creek Pike where previous narcotic transactions have occurred. After waiting for **MILLER** to arrive for several hours, **MILLER** contacted CI1 to change the meeting location and directed CI1 towards Shiloh Springs Road, Trotwood, Ohio. CI1 believed **MILLER** was directing him/her towards 1827 Shiloh Springs Road since CI1 had been there on previous occasions. **MILLER** advised the CI1 that he observed what he (**MILLER**) believed were law enforcement vehicles in the area.

Due to safety concerns and duration of the operation with the recording devices, TCSU Detective Stout decided to end the operation.

27. On that same date, law enforcement received text message data from Verizon based on the May 6, 2019 search and seizure warrant for cellular telephone number (937) 397-1560. These records revealed multiple narcotic conversations between **MILLER** and his customers asking to purchase narcotics from **MILLER**.

28. On or about May 14, 2019, TCSU, FBI and ATF met at a briefing to conduct an undercover purchase of heroin/fentanyl from **MILLER** by CI1. After the brief, TCSU Detective Gregory Stout, Director Robert Green, and I met with CI1 at a predetermined location. While at this location, a search of CI1's person was conducted for contraband and weapons. The search produced negative results. CI1 was provided with an electronic transmitting /recording device and prerecorded buy money to purchase a half ounce of heroin/fentanyl for $1,050.

29. On that same date, at the direction of TCSU, CI1 placed a recorded cellular telephone call to **MILLER** at (937) 397-1560 prior to the controlled operation. CI1 had confirmed that the person he/she spoke to was "Turk." During the course of the call, CI1 asked **MILLER**, "I need a half ounce, got it?" **MILLER** questioned CI1 about why he/she never picked up the previous half ounce from the attempted transaction on May 9, 2019. CI1 told **MILLER** he/she picked up the heroin/fentanyl from another source. **MILLER** told CI1 to meet at Wolf Creek. CI1 was instructed by **MILLER** to go to AC's house located at 4998 Wolf Creek Pike from pervious undercover transactions.

30. At approximately 6:15 p.m., the CI1 arrived at 4998 Wolf Creek Pike. At approximately 6:18 p.m., a dark colored Jeep Cherokee arrived at 4998 Wolf Creek Pike. CI1 met with **MILLER** who was driving the dark colored Jeep Cherokee bearing Ohio license plate number HPQ3085. A law enforcement database search revealed the Jeep Cherokee is registered to "DS." According to CI1, they conducted the transaction through the driver's side window and exchanged the pre-recorded $1,050 for a bag of off-white powder. The recording device captured CI1 providing the pre-recorded buy money to **MILLER** and **MILLER** providing the suspected heroin/fentanyl to CI1. The recording device captured the tattoo "**MILLER**" on **MILLER**'s left forearm. Shortly after the narcotics transaction, CI1 and **MILLER** departed the location. CI1 then proceeded back to a debrief location. During the debrief, the CI1 said **MILLER** had possessed the Jeep for a long time. CI1 believed **MILLER** had just purchased a Chevrolet Suburban as well. The suspected heroin/fentanyl packaged in a plastic baggie weighed approximately 15.1 grams. The suspected heroin/fentanyl was placed into property at the TCSU property room, and later sent to BCI for analysis. Lab results are still pending.

31. A query conducted through the Dayton Police Management Information System (MIS) revealed in January 30, 2019, a traffic stop was conducted on a 2012 Jeep Grand Cherokee bearing Ohio license plate number HPQ3085. During the stop, officers indicated the vehicle had indication of suspected drug dealing. The driver of the vehicle at time was **MILLER** who was extremely uncooperative and become very vocal in using explicit language. As a result, **MILLER** was placed in handcuffs. The field interview report in MIS listed **MILLER's** address as 975 Haller Avenue. Furthermore, the field interview report noted a use of caution when making contact with **MILLER**.

32. On or about May 21, 2019, surveillance was conducted based on locational cell phone data of cellular telephone number (937) 397-1560, which is believed to be used by **MILLER**. On May 2, 2019, United States Magistrate Judge Sharon L. Ovington signed a search warrant under case number 3:19MJ249 for MILLER's cell phone number (937) 397-1560, which authorized locational data for the phone. Based on the locational informational data from the search warrant, FBI SA Kenneth Howard and I observed the location data along with a vehicle believed to driven by **MILLER** located driving west on Stewart Street (away from the University of Dayton campus). The vehicle believed to be driven by **MILLER** was a maroon GMC Terrain with tinted windows. At approximately 3:30 p.m., SA Howard observed at 975 Haller Avenue a dark window tinted, maroon GMC Terrain with no front license plate which was backed into the driveway at 975 Haller Avenue. Shortly after, I observed the maroon GMC Terrain driving south on Haller Avenue and continuing south.

33. On or about May 22, 2019, at approximately 2:47 p.m., surveillance was conducted on **MILLER** at 975 Haller Avenue. SA Howard observed a black male wearing a green jacket entered the driver's side door of the maroon GMC and another male wearing a blue jacket entered the passenger side. At approximately 2:52 p.m., the maroon GMC departed 975 Haller Avenue. At approximately 2:58 p.m., SA Howard observed the maroon GMC license plate number HBF5014. The maroon GMC is registered to PV Holding Corporation which operates AVIS Rental. At approximately, 3:06 p.m., SA Howard observed the maroon GMC pull into the driveway at 2234 Kipling Drive.

34. On May 24, 2019, at approximately 1:22 a.m., Montgomery County Sheriff's Office marked unit conducted a traffic stop of a vehicle bearing Ohio license plate number HBF5014. **MILLER** was driving the 2019 maroon GMC and was the sole occupant of the vehicle.

35. On or about June 10, 2019, a confidential informant (hereinafter referred to as "CI12") advised that **MILLER** was living with his girlfriend, DS.

36. On or about June 18, 2019, surveillance was conducted at 975 Haller Avenue. During the surveillance, FBI SA Tyler Freeman observed a white Ford 150 pick-up truck bearing Ohio license plate number HSQ8912, which is registered to "SM" and which was being driven by a black male. SA Freeman was sent a driver's license photograph of "SM" and **MILLER**. SA Freeman identified **MILLER** as the driver of the Ford 150.

37. On or about June 20, 2019, TCSU, FBI and ATF met at a briefing to conduct an undercover purchase of heroin/fentanyl from **MILLER** by CI1. After the brief, TCSU Detective Gregory Stout, Director Robert Green, and I met with CI1 at a predetermined location. While at this location, a search of the CI1's person was conducted for contraband and weapons. The search produced negative results. CI1 was provided with an electronic transmitting /recording device and prerecorded buy money to purchase a half ounce of heroin/fentanyl for $1,050.

38. At approximately 2:32 p.m., at the direction of TCSU, CI1 placed a recorded cellular telephone call to **MILLER** at (937) 397-1560 prior to the controlled operation. CI1 had confirmed that the person he/she spoke to with "Turk." During the course of the call, CI1 told **MILLER**, "I need to pick up a onion from ya." **MILLER** agreed and told CI1 "come toward Wolf Creek." CI1 asked **MILLER** "how much is it?" **MILLER** replied "21 and then 2,050."

9

CI1 asked **MILLER**, "you just want me to meet you at her house? (meaning AC's location at 4998 Wolf Creek Pike). **MILLER** responded affirmatively.

39. At approximately 2:48 p.m., CI1 arrived at 4998 Wolf Creek Pike. At approximately 2:51 p.m., a dark colored Mitsubishi SUV arrived at 4998 Wolf Creek Pike, which, as later identified by CI1, was being driven by **MILLER**. According to CI1, the black Mitsubishi pulled up door to door with CI1's vehicle and conducted the transaction. The recording device captured CI1 providing the pre-recorded buy money to **MILLER** and **MILLER** providing the suspected heroin/fentanyl to CI1. At 2:54 p.m., upon completion of the transaction, both CI1 and **MILLER** departed 4998 Wolf Creek Pike. CI1 then proceeded back to a debrief location. The suspected heroin/fentanyl packaged in a plastic baggie weighed approximately 29 grams. The suspected heroin/fentanyl was placed into property at the TCSU property room, and later sent to BCI for analysis. Subsequent laboratory results determined the white powder to be 27.66 +/- 0.04 grams of Fentanyl.

40. On June 24, 2019, an administrative subpoena was issued to DP&L for utility subscriber information for **MILLER's** girlfriend DS, and 510 Maryland Avenue, Dayton, Ohio 45404. On that same date, DP&L responded, DS is the utility subscriber at **7707 Tanager Meadows**, and **MILLER** is the utility subscriber at 510 Maryland Avenue.

41. On that same date, FBI Task Force Office ("TFO") Patrick Craun observed the black Mitsubishi SUV bearing Illinois license plate number AU39217 with tinted windows parked in area at **7707 Tanager Meadows**. Through law enforcement database search, the vehicle was found to be registered to PV Holding Corporation, which operates AVIS Rental cars. The black Mitsubishi SUV with tinted windows was like and similar to the black Mitsubishi SUV driven by **MILLER** during the June 20, 2019, undercover purchase at 4998 Wolf Creek Pike.

42. On June 28, 2019, an administrative subpoena was issued to PV Holding Corporation which operates AVIS requesting rental agreement and payment information for the black Mitsubishi SUV bearing Illinois license plate number AU39217.

43. On that same date, surveillance was established at **7707 Tanager Meadows**. During the surveillance, a white Buick Lacrosse bearing temporary license plate number H270487 was parked in front of **7707 Tanager Meadows** and the black Mitsubishi SUV bearing Illinois license plate number AU39217 was parked across from **7707 Tanager Meadows**. The white Buick Lacrosse is registered to **MILLER's** girlfriend DS. The black Mitsubishi is the same vehicle used by **MILLER** during the undercover narcotics transaction on June 20, 2019. At approximately, 8:25 a.m., the white Buick Lacrosse departed **7707 Tanager Meadows**. At 8:37 a.m., FBI SA Robert Buzzard observed the white Buick Lacrosse at Rich Oil on Salem Avenue. SA Buzzard observed DS exit the vehicle.

44. On July 2, 2019, while patrolling north on Dennison Avenue, Dayton Police officers noticed a male standing near a black Kia Sorento bearing Ohio license plate number HRJ9346 which had committed three traffic violations. The officers also noticed the strong odor of marijuana emitting from the vehicle. The officers made contact with a male standing outside of the passenger side of the vehicle with the rear door opened. The male was identified as **Vincent MILLER**. When the officers approached **MILLER**, he appeared to be nervous. The officers had asked if they could pat **MILLER** down due to the smell of marijuana. During the pat down, officers discovered a bag containing marijuana and U.S. currency in the amount of

$820.00. In addition, officers made contact with a male, identified as "DL", sitting in the front passenger of the vehicle. When officers opened the door to make contact with DL, they observed a large gallon-sized plastic bag containing marijuana by DL's feet. After conducting a law enforcement database check of **MILLER** and DL, officers discovered **MILLER** was on probation and DL was on parole. During the search of the vehicle, officers discovered another large gallon bag of marijuana located inside of a large airtight container in the rear seat where **MILLER** had been standing. Also found in the vehicle were six cell phones located in the center console.

45. Continuing on that same date, **MILLER** and DL both denied any knowledge of the marijuana. **MILLER** told the officers that he had rented the vehicle and the rental agreement was in the glove box. Officers found the rental agreement from AVIS (operating as PV Holding Corporation) belonging to **MILLER**. Officers also discovered a wallet with **MILLER's** driver's license on the front passenger side of the floorboard. **MILLER** and DL were both read their Miranda Rights and were taken to the Montgomery County Jail.

46. On or about July 3, 2019, a call detail records and cell tower analysis of telephone records for cellular telephone number (937) 397-1560 associated with **MILLER** revealed the cellular telephone was located in and around the area of 4998 Wolf Creek Pike and **7707 Tanager Meadows** during the time period between April 2019 through June 4. The call detail records and cell tower analysis records were obtained through a search warrant signed by the United States Magistrate Judge Michael J. Newman on June 4, 2019, under case number 3:19MJ304.

47. On July 9, 2019, TCSU detectives learned through a law enforcement database that **MILLER** was arrested by Trotwood Police Department on July 8, 2019 at approximately 4:54 p.m. **MILLER** was arrested in a white Buick Lacrosse bearing temporary license plate number H270487. The white Buick Lacrosse is registered to **MILLER's** girlfriend, "DS". During the traffic stop, **MILLER** was driving the Buick LaCrosse and his girlfriend, DS, was a passenger. The Trotwood officer conducted a law enforcement database check on **MILLER** and discovered he had numerous previous possession of drug charges. As result, the Trotwood officer requested a K-9 to arrive at the scene. The K-9 conducted a free air search and alerted to the presence of narcotics. After the free air search was completed by the K-9, the Trotwood officer searched the vehicle and found a small baggie of marijuana, a marijuana grinder, and pills that were confirmed to be Acetaminophen and Oxycodone Hydrochloride. Also, found in the vehicle were numerous flip cell phones that were ringing, and two Ohio license plate bearing the numbers HMP1446 and HPQ3085. Both of the Ohio license plates were registered to a Jeep in the name of **MILLER's** girlfriend, DS.

48. On July 9, 2019 at approximately 1:40 pm, TCSU Detective Stout briefed command staff members of the Kettering Regional SWAT Team of the QUILLEN investigation. While observing 125 Perrine Street as part of the QUILLEN investigation, a white sedan stopped and parked in front of 125 Perrine Street. An African American male exited the passenger seat wearing a black t-shirt and blue jeans. The male walked onto the front porch of 125 Perrine Street and stayed there for approximately three minutes. It appeared that nobody was answering the door for him. The male held his cellular telephone to his ear and stood on the edge of the porch, facing Perrine Street as Detective Stout and SWAT command drove by. Detective Stout identified this male as **MILLER** from a distance of about twenty feet in clear daylight.

49. According to a law enforcement database, **MILLER** was released from the Montgomery County Jail on July 9, 2019 at 1:10 pm.

## IV. CONCLUSION

50. Based on the facts set forth in the Affidavit, I believe there is probable cause to believe that, in the Southern District of Ohio and elsewhere, on or about April 2, 2019; April 18, 2019; and June 20, 2019, **MILLER** committed violations of 21 U.S.C. § 841(a)(1) and (b)(1)(C) (possession with intent to distribute and distribution of controlled substances).

51. Based on the facts set forth in the Affidavit, I further believe there is probable cause to believe that evidence, contraband, fruits of a crime, other items illegally possessed as well as property designed for use, intended for use, or used in committing violations of 21 U.S.C. §§ 841 and 846) (conspiracy to distribute and possess with intent to distribute controlled substances) exists and can be found at the following location:

   a. **7707 Tanager Meadows, Dayton, Ohio 45426,** including any outbuildings and curtilage at this location.

Dennis C. Eng
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this 10th day of July, 2019.

SHARON L. OVINGTON
UNITED STATES MAGISTRATE JUDGE

12

## ATTACHMENT "A"

## DESCRIPTION OF LOCATIONS TO BE SEARCHED

A. **LOCATION A: 7707 Tanager Meadows, Dayton Ohio 45426,** more specifically described as a brown and tan colored condominium, two-story, with a gray-colored roof. The residence is the unit depicted in the lower image with the porch light on and bicycle in front. The numbering for the residence is on the outside wall next to the window as shown.



13



## ATTACHMENT "B"

## PROPERTY TO BE SEIZED

A. Log books, records, payment receipts, notes, and/or customer lists, ledgers, and other papers or electronic records relating to the transportation, ordering, purchasing, processing, and distribution of controlled substances.

B. Papers, tickets, notices, credit card receipts, travel schedules, travel receipts, passports, and/or records, and other items relating to domestic and foreign travel to obtain and distribute narcotics and narcotics proceeds, including, but not limited to airline receipts, vehicle rental receipts, credit card receipts, travel schedules, diaries, hotel receipts, truck logs, travel agency vouchers, notes, records of long distance telephone calls, e-mail and other correspondence.

C. Address and/or telephone books and papers reflecting names, e-mail and physical addresses and/or telephone numbers of individuals, partnerships, or corporations involved in drug trafficking and money laundering.

D. Financial records, financial statements, receipts, statements of accounts and related bank records, money, drafts, letters of credit, money orders and cashier's checks receipts, passbooks, bank checks, escrow documents, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money.

E. Electronic equipment such as pagers, computers, electronic organizers, facsimile machines, cellular telephones, caller ID, telephone answering machines, police scanners and two-way radios.

F. United States currency, precious metals, coins bullion, jewelry, and financial instruments, including, but not limited to stocks and bonds.

G. Photographs and/or photographic albums or video tapes and recordings of houses and other real estate, automobiles, and of other assets, persons, and/or controlled substances.

H. Indicia of occupancy, residency, and/or ownership of the premises, and vehicles including, but not limited to utility and telephone bills, canceled envelopes, keys, deeds, tax bills, titles, vehicle registrations and documentation regarding storage units/lockers.

I. Illegal drugs and other materials, paraphernalia and/or equipment and tools used in the drug trade.

J. Firearms and ammunition.